IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BRANDY D. GOLEMAN, | ) | |
| NEXT FRIEND OF B.C.G., | ) | |
| A MINOR, | ) | |
| | ) | |
| PLAINTIFF, | ) | A CIVIL ACTION |
| | ) | |
| vs. | ) | JURY DEMAND |
| | ) | |
| MOBILE COUNTY PUBLIC | ) | |
| SCHOOLS | ) | |
| | ) | |
| DEFENDANT. | ) | |

# COMPLAINT

## PARTIES

1. BRANDY D. GOLEMAN commences this civil action as next friend for her natural son, B.C.G., a minor, *see* FRCP 17, who was a Fifth Grader at Meadowlake Elementary School.

2. Defendant MOBILE COUNTY PUBLIC SCHOOLS is the Local Education Agency and an Alabama governmental entity that bears exclusive responsibility for the operation, management, and control of Meadowlake Elementary School.

## JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), this court possesses original jurisdiction of the plaintiff's claims brought pursuant to § 504 of the Rehabilitation Act of 1973, and the ADA.

4. Pursuant to 28 U.S.C. § 1391(b), venue in this district is appropriate because it is the district in which a substantial part of the acts, omissions, and events occurred that form the basis of this lawsuit.

## FACTS

5. The minor child, B.C.G., was born with Arthrogryposis. It is a condition which should be treated with vigorous physical therapy. *See*, *e.g.*, *Pinkerton v. Spellings*, 529 F.3d 513 (5th Cir. 2008)("arthrogryposis . . . causes developmental abnormalities such as shortness of limbs, deformed joints, and limitation of motion in limbs."); *K.I. ex rel. Jennie v. Montgomery Public Schools*, 805 F. Supp. 2d 1283 (M.D. Ala. 2011)   ("Arthrogryposis is characterized by multiple joint contractures, muscle weakness, and fibrosis. Typically, arthrogryposis is a non-progressive disease but cannot be reversed. Vigorous physical therapy and in some cases surgical intervention have been shown to improve quality of life.") *H.C. v. Colton Pierrepont Cent. School Dist.*, No. 7: 07-CV-944 (N.D.N.Y. July 29, 2008)(

"Arthrogryposis may lead to bone overdevelopment or osteoporosis because abnormal muscle stress creates abnormal bone stress. The condition typically is treated with physical therapy ("PT"), occupational therapy ("OT"), splints, and surgery.")

6. B.C.G. has no ankles. His ankles were surgically removed. As a result, he walks in a stilted manner because his feet cannot articulate as he ambulates. This causes B.C.G. to have a high risk of falls, and, due to this Arthrogryposis, he has a high risk of bone breakage if he falls.

7. B.C.G.'s 2020-2021 IEP concluded that "B.C.G. requires assistance by an adult in transiting up and down steps."  However, on January 14, 2021, B.C.G. was in his Physical Education class. Although B.C.G.'s IEP called for him to be in the general education class, it was the practice of the physical education teacher to send B.C.G. up onto a stage and off the floor where the general education students were engaged in PE class. The school had a ramp leading up to the stage designed for handicapped students, however, the ramp was blocked. B.C.G. was not being assisted by an adult as he attempted to climb the stairs up to the stage. B.C.G. fell and sustained a severe and complete fracture in the middle femoral shaft (the bone running from the hip to the knee) and further required orthopedic screws to be implanted into other aspects of his leg. Consequently, B.C.G. is bed ridden

and cannot use the bathroom, cannot bathe, and could not attend school except virtually.

## COUNT ONE: FOR MONETARY DAMAGES UNDER § 504 OF THE REHABILITATION ACT OF 1973  THE AMERICANS WITH DISABILITIES ACT

8. On January 14, 2021, the District blocked an access ramp for disabled students and persons which resulted in the student being forced to ascend stairs up to an auditorium stage where the student was attending general education classes with his classmates.  As a result of the blocked disability access ramp, and being forced to ascend stairs, the student fell and suffered severe orthopedic injuries requiring implantation of orthopedic hardware to address severe personal injury.  As a result of the severe orthopedic injuries, the student was forced to cease attending school in order to heal.

9. In 1990, the ADA was enacted "to remedy widespread discrimination against disabled individuals" and to "provide clear, strong, consistent, enforceable standards" addressing that discrimination. 42 U.S.C. § 12101(b)(2); PGA Tour, Inc. v. Martin, 532 U.S. 661, 674, 121 S. Ct. 1879, 1889 (2001). Title II prohibits discrimination by public entities (state or local governments). AL BY DL v. Walt Disney Parks and Resorts, 900 F.3d 1270 (11th Cir. 2018); 42 U.S.C. § 12131. It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. § 12132.

10. The ADA aims to "provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). Congress enacted the statute on the premise that discrimination against the disabled is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." Alexander v. Choate, 469 U.S. 287, 295, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)

11. The statutory definition of "disability" is provided before the several Titles and applies to the ADA as a whole. 42 U.S.C. § 12102. Under the ADA, a person has a "disability" if he (A) has "a physical or mental impairment that substantially limits one or more major life activities," (B) has "a record of such an impairment," or (C) is "regarded as having such an impairment." 42 U.S.C. § 12102(1). The statute provides a non-exhaustive list of "major life activities" that includes "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). AL BY DL v. Walt Disney Parks and Resorts, 900 F.3d 1270 (11th Cir. 2018).

12. Title II defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications … or the provisions of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131 (2).

13. Plaintiff is "disabled" within the meaning of both the Americans With Disabilities Act and under § 504 of The Rehabilitation Act.

14. At all times material to this case, the District knew that Plaintiff was disabled within the meaning of both the Americans with Disabilities Act and under § 504 of The Rehabilitation Act.

15. Title II requires only "reasonable modifications that would not fundamentally alter the nature of the service provided." <u>Tennessee v. Lane</u>, 124 S.Ct. 1978, 1993 (2004). For example, in its attempt to equalize physical access to public buildings, Congress imposed reasonable architectural standards for new construction and allowed for less costly measures for older facilities. See 28 C.F.R. § 35.151; 28 C.F.R. § 35.150(b)(1). <u>Ass'n for Disabled Americans v. Fla. Intern. Univ.</u>, 405 F.3d 954, 959 (11th Cir. 2005).

16. Unlike many ADA cases based on the lack of a facility ever establishing a route of access, ingress or egress for a disabled individual, this case presents

the very different factual scenario of a facility having blocked a route of access intended to comply with the ADA.

17. In Cohen v. City of Culver City, 754 F.3d 690 (9th Cir. 2014), a city was held subject to liability for blocking an ADA access route for the disabled:

   a. "We confront entirely different circumstances here, where the City was in compliance with the ADA, but allowed elimination of the disabled access it had built." Cohen v. City of Culver City, 754 F.3d 690 (9th Cir. 2014)

   b. "The City chose to alter the existing arrangement of the public sidewalk by allowing private vendors to set up displays for the purpose of holding a car show. The vendors' presence was entirely unrelated to the goal of making the City's programs or services accessible to disabled persons. It would not have imposed an additional burden on the City for it to require the vendors to locate their booths a few feet in either direction to avoid blocking disabled ramps." Cohen v. City of Culver City, 754 F.3d 690 (9th Cir. 2014)

   c. The City must "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part." 28 C.F.R. § 35.133(a). Because the regulations define "facility" to

include "any portion of ... roads, walks, or passageways," city sidewalks are among those facilities that the City must maintain in operable working condition. See id. § 35.104. Only "isolated or temporary interruptions in service or access due to maintenance or repairs" are permissible. Id. § 35.133(b). The rationale for this requirement is obvious: there is little point in building an accessible route if it is not kept in a condition that allows disabled persons to use it. See 28 C.F.R. pt. 35, app. B. As the guidance accompanying this regulation makes clear, the City is therefore required to keep disabled access routes "free of obstructions." Id. While temporary obstructions do not violate the ADA, obstructions that persist beyond a reasonable period of time do violate the statute. Id. Cohen v. City of Culver City, 754 F.3d 690 (9th Cir. 2014)

d. "A genuine dispute of material fact exists as to whether this particular curb ramp was "required" to make the sidewalk "readily accessible" to persons with disabilities. 28 C.F.R. § 35.133(a)..." Cohen v. City of Culver City, 754 F.3d 690 (9th Cir. 2014

e. A genuine dispute of material fact also exists as to whether the City failed to maintain this curb ramp in "operable working condition," 28 C.F.R. § 35.133(a), by allowing the private vendor's booth to block the

      ramp for more than "a reasonable time," 28 C.F.R. pt. 35, app. B. The trier of fact must determine whether the duration of the obstruction was reasonable. <u>Cohen v. City of Culver City</u>, 754 F.3d 690 (9th Cir. 2014)

    f. "Obstructed sidewalks exclude disabled persons from ordinary communal life and force them to risk serious injury to undertake daily activities. This is precisely the sort of "subtle" discrimination stemming from "thoughtlessness and indifference" that the ADA aims to abolish. Chapman, 631 F.3d at 944–45." <u>Cohen v. City of Culver City</u>, 754 F.3d 690 (9th Cir. 2014)

18. Other case law forbids obstruction of ADA access routes for the disabled:

    a. <u>Rossman v. Dollar Gen. Corp</u>., 368 F.Supp.3d 422 (N.D. N.Y. 2019)("[A]n isolated or temporary hindrance to access does not give rise to a claim under the ADA. But the cases so holding have generally concerned truly isolated failures to maintain readily accessible facilities.")

    b. See, e.g., <u>Burnett v. Ocean Props., Ltd</u>., 327 F.Supp.3d 198 (D. Me. 2018), stating:

        i. "[F]ederal regulations implementing the ADA require public entities 'maintain in operable working condition those features

9

of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities,' 28 C.F.R. § 35.133(a), this requirement 'does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs,' 28 C.F.R. § 35.133(b); see also <u>Forestier Fradera [v. Municipality of Mayaguez]</u>, 440 F.3d [17][,] 22 [ (1st Cir. 2006) ] (finding no liability under the ADA for delay in installation of elevator due to "the inevitable complications arising from a major, publicly funded construction project on a historic building"). In such cases, a public entity may fulfill its obligation to persons with disabilities 'through such means as ... delivery of services at alternate accessible sites ... or any other methods that result in making its services ... readily accessible to and usable by individuals with disabilities.' 28 C.F.R. § 35.150(b)(1)."

c. <u>Gregory v. Otac, Inc.</u>, 247 F.Supp.2d 764 (D. Md. 2003)("But no provision of the ADA requires a place of public accommodation to provide an alternate entrance ramp for quicker access when the one connecting its disabled parking spaces to the facility is temporarily blocked by other disabled persons.")

19. The segregation of the student in this case away from his classmates violated his general education IEP plan. Unnecessary social isolation of a disabled student from the non-disabled students is actionable 504 and ADA discrimination, as held in <u>JS v. Houston County Bd. Of Education</u>, 877 F.3d 979 (11th Cir. 2017), which reasoned:

> "In <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Supreme Court concluded that unjustified institutional isolation of persons with disabilities is a form of discrimination based on disability under Title II. See id. at 599-600, 119 S.Ct. 2176. The Court considered two important factors in coming to this conclusion: one, that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life"; and, two, that "confinement in an institution severely diminishes the everyday life activities of individuals." Id. at 600-01, 119 S.Ct. 2176.
>
> . . . .
>
> "Isolation via institutionalization is admittedly a more extreme and restrictive action than removal from a school classroom, but the reasoning in Olmstead seems to apply here. J.S. has alleged — and

> 987*987 has provided evidence tending to show — that he was, with some frequency, excluded and isolated from his classroom and peers on the basis of his disability. Although the circumstances alleged here do involve a violation of J.S.' IEP, they also implicate those further, intangible consequences of discrimination contemplated in Olmstead that could result from isolation, such as stigmatization and deprivation of opportunities for enriching interaction with fellow students. These injuries reach beyond a misdiagnosis or failure to provide appropriate remedial coursework. Compare K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist., 381 F.Supp.2d 343, 360 (S.D.N.Y. 2005) (recognizing that "unnecessary social isolation has been considered a form of actionable discrimination" and concluding that, in light of Olmstead, a disabled student's isolation during lunch appears to be such a claim), with Sellers, 141 F.3d at 529 (concluding that allegations that a school board failed to recognize a student's disability based on test scores were insufficient to state a claim under § 504). Accordingly, the district court erred in analyzing this claim as merely a FAPE violation under the IDEA.

20. To state a claim under Title II of the ADA, a plaintiff must generally prove (1) that he is a qualified individual with a disability; (2) that he was either

excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. <u>Bircoll v. Miami-Dade County</u>, 480 F.3d 1072, 1083 (11th Cir. 2007).

21. The District's violations also amount to discrimination prohibited by the § 504 of the Rehabilitation Act of 1973. <u>Fry v. Napoleon Community Schools</u>, 137 S.Ct. 743 (2017); <u>JS v. Houston County Bd. of Education</u>, 877 F.3d 979 (11th Cir. 2017).

22. The District deprived Plaintiff of the required supervision and services required by law, excluded him from and denied him the benefits of public, federally supported programs and facilities operated by the District, and, ultimately, led to and caused him discrimination and damages.

23. The District's acts or omissions toward Plaintiff's disabilities effectively excluded Plaintiff from participating in, and receiving full access to, the benefits of the District's curriculum, programs, and activities.

24. The District's conduct was deliberately indifferent to the Plaintiff's disabilities and in violation of the Americans With Disabilities Act, § 504 of The Rehabilitation Act, and their implementing regulations. <u>JS v. Houston County Bd. of Education</u>, 877 F.3d 979 (11th Cir. 2017).

25. Plaintiff suffered mental anguish and/or emotional distress as a proximate result.[1]

26. Plaintiff demands damages.[2]

27. Wherefore, Plaintiff demands damages as permitted by Section 504 and the ADA, attorney's fees, and costs.

28. Trial by jury is demanded.

---

[1] Plaintiff alleges only, and claims only "garden variety" emotional distress and/or mental anguish. *See, e.g., Davidson v. Liberty Mutual Insurance Company*, No. CA 16-0516-KD-C (S.D. Ala. Dec. 8, 2016); *see also, McBride v. Houston Cty. Health Care Auth.*, No. 1:12CV1047- MHT-TFM (M.D. Ala. Feb. 24, 2014)("plaintiff does not put his or her mental health at issue by simply alleging mental anguish or 'garden variety' emotional distress.") (Id.)(emphasis added)(citing in note 5, *Ortiz-Carballo v. Ellspermann*, No. 5:08-cv-165-Oc-10GRJ, 2009 WL 961131, at *2 (M.D.Fla. Apr.7, 2009) ("The majority of federal courts that have addressed the issue have held that a party does not place his mental condition in controversy merely by requesting damages for mental anguish or 'garden variety' emotional distress."); *Stevenson v. Stanley Bostitch, Inc.*, 201 F.R.D. 551, 553 (N.D.Ga.2001) ("The majority of courts have held that plaintiffs do not place their mental condition in controversy merely by claiming damages for mental anguish or 'garden variety' emotional distress."))

[2] "In the ordinary course, proof of a Title II or § 504 violation entitles a plaintiff only to injunctive relief." Silberman v. Miami Dade Transit , 927 F.3d 1123, 1134 (11th Cir. 2019). However, Title II also authorizes private suits for money damages. 642 U.S.C. § 12133; Tennessee v. Lane, 541 U.S. 509, 517, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); Silberman v. Miami Dade Transit , 927 F.3d 1123, 1134 (11th Cir. 2019); Liese v. Indian River Cty. Hosp. Dist. , 701 F.3d 334, 345 (11th Cir. 2012)

14

*/s/ Henry L. ("Max") Cassady, Jr.*
Cassady & Cassady, P.C.
201 Rural Street
Evergreen, Alabama 36401
Tel: 251.578.5252

*/s/ Utopia Conger Cassady*
Cassady & Cassady, P.C.
201 Rural Street
Evergreen, Alabama 36401
Tel: 251.578.5252